[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 08-16961
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 6, 2013
JOHN LEY
CLERK

Agency No. 40 CFR PART 52


ALABAMA ENVIRONMENTAL COUNCIL,
SIERRA CLUB,
NATURAL RESOURCES DEFENSE COUNCIL,
OUR CHILDREN'S EARTH FOUNDATION,

Petitioners,

versus

ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondents,

ALABAMA POWER COMPANY,
TENNESSEE VALLEY AUTHORITY,
ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT,

Intervenors.
_____

No. 11-11549
_____

Agency No. 40 CFR Part 52

ALABAMA POWER COMPANY,

                                                       Petitioner,

versus

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
ADMINISTRATOR,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

                                                  Respondents,

ALABAMA ENVIRONMENTAL COUNCIL,
OUR CHILDREN'S EARTH FOUNDATION,
SIERRA CLUB,

                                                  Intervenors.

_____

Petitions for Review of Final Action
of the United States Environmental Protection Agency
_____

(March 6, 2013)

Before TJOFLAT and BLACK, Circuit Judges, and MOLLOY,[*] District Judge.

BLACK, Circuit Judge:

---

[*] Honorable Donald W. Molloy, United States District Judge for the District of Montana, sitting by designation.

These consolidated appeals focus on a Clean Air Act[1] visible emissions regulation promulgated by the State of Alabama and submitted to the United States Environmental Protection Agency (EPA) as a revision to Alabama's State Implementation Plan (SIP).  In 2008, the EPA approved the revision after concluding the proposed regulation satisfied the Clean Air Act's requirements (2008 approval).  The EPA denied a timely request in 2009 that it reconsider its approval, but, when confronted with a second reconsideration request the following month, the EPA's new Acting Regional Administrator granted the request.  In April of 2009, the EPA moved this Court to grant a limited voluntary remand.  We granted the motion, remanding the case "on a limited basis for purposes of reconsidering the final rule under review."  In 2011, following such reconsideration, the EPA disapproved the revision (2011 disapproval).

Petitions for review of both the 2008 approval and the 2011 disapproval are before us.  Alabama Power supports the 2008 approval and asks us to affirm the approval as the only lawful action the EPA has taken on the proposed regulation. The Alabama Environmental Council, Sierra Club, Natural Resources Defense Council, and Our Children's Earth Foundation (Citizens) support the 2011

---

[1]  42 U.S.C. §§ 7401 *et seq.*

3

disapproval and ask us to affirm that action. The EPA is defending the 2011 disapproval and contends we should not review the 2008 approval.

After a discussion of the statutory background and the factual and procedural history of the two petitions, we first consider whether the EPA's 2011 disapproval was conducted in compliance with the statutory procedures set forth in the Clean Air Act. We conclude the 2011 disapproval was unauthorized by the Clean Air Act because the EPA failed to make the statutorily required error determination. We next reject the EPA's reliance on its inherent authority and this Court's remand order as authorization for the 2011 disapproval. Finally, we address and dismiss challenges to the 2008 approval, and affirm the validity of that action.

## I. *Statutory Background*

The Clean Air Act aims to "protect and enhance the quality of the Nation's air resources, " 42 U.S.C. § 7401(b)(1), and "sets out a two-stage process for achieving this goal," *Sierra Club v. Ga. Power Co.*, 443 F.3d 1346, 1348 (11th Cir. 2006). At the first stage, the EPA identifies air pollutants that endanger the public, then formulates national ambient air quality standards (NAAQS) to regulate these pollutants. 42 U.S.C. § 7409; *Ga. Power*, 443 F.3d at 1348. At the second stage, each state develops a SIP to ensure its air meets the NAAQS for the

various pollutants. 42 U.S.C. § 7410; *Ga. Power*, 443 F.3d at 1348. The SIP must be submitted for review by the EPA, 42 U.S.C. § 7410(a)(1), and becomes federally enforceable once it is approved and adopted by the EPA, 42 U.S.C. § 7410(k).

The Clean Air Act thus provides a cooperative-federalism approach to air quality regulation. *See Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 581 (5th Cir. 1981) ("Congress chose a balanced scheme of state-federal interaction to implement the goals of the [Clean Air] Act.").[2] Under this approach, states have "primary responsibility for ensuring that the ambient air meets the NAAQS for the identified pollutants," *Ky. Res. Council, Inc. v. EPA*, 467 F.3d 986, 988 (6th Cir. 2006), and "so long as the ultimate effect of a State's choice of emission limitations is compliance with the national standards for ambient air, the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation," *Train v. NRDC, Inc.*, 421 U.S. 60, 79, 95 S. Ct. 1470, 1482 (1975). "The great flexibility accorded the states under the Clean Air Act is . . . illustrated by the sharply contrasting, narrow role to be played by the EPA." *Fla. Power & Light Co.*, 650 F.2d at 587. If the SIP revision meets the requirements in

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

the Clean Air Act, the EPA must approve it. *See* 42 U.S.C. § 7410(k)(3) ("[T]he Administrator *shall* approve [a SIP or SIP revision] as a whole if it meets all of the applicable requirements of this chapter." (emphasis added)).

To obtain approval by the EPA, the SIP must comply with the Clean Air Act requirements set forth at 42 U.S.C. § 7410(a)(2), which mandates, *inter alia*, the inclusion of "enforceable emission limitations and other control measures, means, or techniques . . . as may be necessary or appropriate to meet the applicable [Clean Air Act] requirements." 42 U.S.C. § 7410(a)(2)(A); *see also Ga. Power*, 443 F.3d at 1348. Once approved, a SIP may not be unilaterally modified by either the state or the EPA: "no . . . plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator [of the EPA]." 42 U.S.C. § 7410(i). The Clean Air Act does, however, provide cooperative processes for modifying a SIP that may be initiated by either the EPA or the state.

A "SIP Call" is one mechanism by which the EPA may initiate a modification to a SIP. Clean Air Act § 110(k)(5); 42 U.S.C. § 7410(k)(5). Section 110(k)(5), entitled "[c]alls for plan revisions," outlines the "SIP Call" procedure:

> Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard . . . the Administrator shall require the State to revise the plan as necessary to correct such inadequacies. The Administrator shall notify the State of the inadequacies, and may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions. Such findings and notice shall be public.

42 U.S.C. § 7410(k)(5). Thus, "whenever" the EPA makes a "substantial inadequacy" determination, the SIP Call procedure requires the EPA to (1) notify the state of the substantial inadequacy, and (2) give the state the first opportunity to revise the SIP to conform with the Clean Air Act. *Id.*

Prior to 1990, a SIP Call was the only mechanism by which the EPA could initiate a modification to a SIP. In 1990, however, Congress added a separate provision permitting the EPA to initiate a "correction" to a SIP or SIP revision which had been approved or disapproved "in error." Clean Air Act § 110(k)(6); 42 U.S.C. § 7410(k)(6). Section 110(k)(6), entitled "[c]orrections," provides:

> Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof) . . . was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

42 U.S.C. § 7410(k)(6). In contrast to the SIP Call procedure, Section 110(k)(6) permits the EPA, after determining a prior action approving or disapproving a plan revision "was in error," to revise the action without "requiring any further submission from the State." *Id.* Section 110(k)(6) provides a procedure for the EPA to follow in revising the prior action: the action may be revised "in the same manner as the approval, disapproval, or promulgation," and the "determination and basis thereof shall be provided to the State and public." *Id.*

A state may also voluntarily initiate a revision to its SIP. 42 U.S.C. § 7410(a)(1). "If a state wants to add, delete, or otherwise modify any SIP provision, it must submit the proposed change to EPA for approval." *Sierra Club v. Tenn. Valley Auth.*, 430 F.3d 1337, 1346 (11th Cir. 2005) (citing 40 C.F.R. § 52.1384). Before adopting and submitting the revision to the EPA, the state must hold public hearings and accept public comments. 42 U.S.C. § 7410(a); *Tenn. Valley Auth.*, 430 F.3d at 1348 (citing 40 C.F.R. § 51.102). The EPA "shall not" approve a SIP revision "if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress . . . or any other applicable requirement of [the Clean Air Act]." Clean Air Act § 110(*l*); 42 U.S.C. § 7410(*l*).

II. *Factual and Procedural Background*

8

Under the scheme set forth in the Clean Air Act, Alabama—through the Alabama Department of Environmental Management (ADEM), and its oversight body, the Alabama Environmental Management Commission (AEMC)—is the primary regulator of the state industries' visible emissions.[3] Of relevance here, the visible emissions portion of Alabama's SIP regulates opacity, which is "one of the most basic emission limitations imposed on sources of particulate air pollution." *Tenn. Valley Auth.*, 430 F.3d at 1341. Opacity is not a pollutant; rather, it "is a measure of the light-blocking property of a plant's emissions, which is important in the Clean Air Act regulatory scheme as an indicator of the amount of visible particulate pollution being discharged by a source." *Id.* Opacity is thus related to particulate matter (PM), a regulated pollutant under the Clean Air Act.

Alabama's SIP judges compliance with opacity regulations using the EPA Method 9 test, which is a visual observation by a trained human observer. Ala. Admin. Code r. 335-3-4-.01(2). As a supplement to the Method 9 test, but not a replacement, Alabama's SIP requires certain facilities to operate a continuous opacity monitoring system (COMS), *id.* at 335-3-12-.02, which is an electronic

---

[3] Alabama's SIP is codified at 40 C.F.R. § 52.69 and incorporates by reference certain provisions of ADEM's Air Pollution Control Program regulations set out at Ala. Admin. Code r. 335-3-1 *et seq.* ADEM develops SIP regulations, which are approved, disapproved, or modified by the AEMC. *See* Ala. Code § 22-22A-8.

device that records opacity measurements every six-minutes, as a six-minute average. A COMS thus produces up to 240 separate readings per day, and these "[m]ore frequent readings with COMS help determine whether a source is following good air pollution control practices between Method 9 . . . tests." Alabama: Proposed Approval of Revisions to the Visible Emissions Rule, 72 Fed. Reg. 18,428, 18,431 (April 12, 2007).

For well over a decade, Alabama's SIP has prohibited sources from emitting at levels beyond 20% opacity, as determined by a six-minute average. Ala. Admin. Code r. 335-3-4-.01(1)(a)(1996). There are exceptions. One exception permits up to 100% opacity during "startup, shutdown, load change, and rate change or other short, intermittent periods of time" as approved by ADEM. *Id.* at 335-3-4-.01(1)(c). Another exception permits up to 40% opacity during one six-minute period every hour. *Id.* at 335-3-4-.01(1)(b). In 2003, however, ADEM sought to broaden the 40% exception to allow sources with COMS to emit "up to 100 percent opacity for up to two percent of the quarterly operating time that they are otherwise subject to the 20 percent opacity limit." 72 Fed. Reg. at 18,431. The EPA's handling of a subsequent iteration of this proposed revision is the central issue on appeal.

A.   *Alabama's 2003 Proposed Revision to the Visible Emissions Rule*

ADEM formally adopted the proposed revision—also known as the "2% de minimis rule"—and submitted it to the EPA as a SIP revision in 2003. *Tenn. Valley Auth.*, 430 F.3d at 1342. The rule provided a safe harbor from the 20% opacity limitation if "'[d]uring each calendar quarter . . . the non-exempt excess emissions periods do not exceed 2.0 percent of the source operating hours for which the opacity standard is applicable and for which the COMS is indicating valid data.'" *Id.* (quoting Ala. Admin. Code r. 335-3-4-.01(4)). Prior to formally adopting the 2003 proposed revision, ADEM had followed the rule for years in practice, informally using it "to excuse thousands of opacity violations." *Id.* at 1342, 1348.

While the EPA was reviewing the 2003 proposed revision, this Court issued a decision in a citizen suit brought against Tennessee Valley Authority (TVA) using COMS data. *Tenn. Valley Auth.*, 430 F.3d at 1337. We considered whether the "2% de minimis rule"—which had yet to be approved by the EPA and thus was not yet part of Alabama's SIP—applied to alleged opacity violations by TVA occurring between 1997 and 2002. *Id.* at 1339. We noted that the rule, followed only as an informal practice at all times relevant to the suit, was "tantamount to an unapproved modification of the opacity limitation contained in the Alabama SIP." *Id.* at 1346–47. Because ADEM had attempted "to unilaterally revise the opacity

11

limitation without submitting the revision to the rigors of the SIP amendment process," *id.* at 1348, we held that "ADEM's practice of employing the 2% de minimis rule to determine violations of the 20% opacity limitation using COMS data was invalid under Clean Air Act § 110(i)," *id.* at 1349.

Subsequent to our decision in *Tennessee Valley Authority*, in April 2007, the EPA concluded that ADEM's 2003 proposed revision was "not approvable as submitted." Alabama: Proposed Approval of Revisions to the Visible Emissions Rule, 72 Fed. Reg. 18,428, 18,430 (April 12, 2007). The EPA proposed to approve the revision if ADEM supplemented the request to show that opacity levels, "averaged" over a quarter of a year, would be at least as stringent as existing law. *Id.* at 18,430–31. The EPA notified and provided the public with an opportunity to comment on the conditional proposal to approve ADEM's request. 72 Fed. Reg. at 18,434. Citizens provided comments, urging the agency to disapprove the revision. Comments urging approval were submitted by ADEM, TVA, and the Utility Air Regulatory Group (UARG).[4]

B.     *The EPA's 2008 Approval of Alabama's SIP Revision*

---

[4] The UARG moved for leave to file an amicus brief in support of Alabama Power and vacatur of the 2011 disapproval. The UARG's motion is hereby denied.

12

ADEM made the revisions requested by the EPA, as well as additional revisions to address public comments. First, ADEM clarified that the once-per-hour allowance of up to 40% opacity would not apply to sources using COMS. Ala. Admin. Code r. 335-3-4-.01(4) (2008).[5] Second, for sources using COMS, ADEM added a cap on daily average opacity of 22%, which was the effective allowable daily average opacity for those sources under the unrevised rule. Ala. Admin. Code r. 335-3-4-.01(5) (2008).[6] ADEM issued public notice of the revision, took public comment, and held a public hearing. On August 22, 2008, AEMC adopted the rule, and ADEM submitted the proposed revision to the EPA for review.

On October 15, 2008, the EPA approved ADEM's revision request. *See Alabama: Approval of Revisions to the Visible Emissions Rule*, 73 Fed. Reg.

---

[5] Paragraph four describes the exception as follows:

[D]uring each calendar quarter, the permittee may discharge into the atmosphere from any emissions unit qualifying under paragraph (3) of this rule, particulate with an opacity exceeding 20% for not more than twenty-four (24), six (6) minute periods in any calendar day, if such periods do not exceed 2.0 percent of the source calendar quarter operating hours for which the opacity standard is applicable and for which the COMS is indicating valid data.

Ala. Admin. Code r. 335-3-4-.01(4) (2008).

[6] Specifically, paragraph five states: "No permittee shall discharge into the atmosphere from any source of emission particulate of an opacity greater than 22% (excluding exempt periods allowed under subparagraphs (1)(c) and (1)(d) of this rule) averaged over each calendar day." Ala. Admin. Code r. 335-3-4-.01(5) (2008).

60,957 (October 15, 2008). The EPA determined that ADEM had made "the necessary revisions proposed by EPA" and that the changes were consistent with the EPA's recommendations. *Id.* at 60,957–58. The EPA noted that the "modeling presented by commenters show[ed] the possibility of an impact on the NAAQS under a worst-case scenario." *Id.* at 60,962. However, the EPA concluded it lacked "the data necessary to determine quantitatively what impact, if any, the revisions . . . would or could have on . . . PM emissions," *id.*, and thus determined "the proposed SIP revision satisfie[d] the requirements of section 110(l) of the [Clean Air Act]," *id.* at 60,959.

The EPA's approval became final and effective on November 14, 2008. *Id.* at 60,957. At that point, the proposed revision became part of the federally approved Alabama SIP. Sources operating COMS were required to comply with the revisions "within 6 months of . . . EPA approval." Ala. Admin. Code r. 335-3-4-.01(7) (2008). Citizens petitioned the EPA to reconsider its approval, but the EPA denied the request on January 15, 2009.

C.    *Citizens' Judicial Challenge to the EPA's 2008 Approval*

On December 12, 2008, Citizens filed a petition in this Court for review of the EPA's approval of the SIP revision. Alabama Power, ADEM, and TVA intervened in support of the EPA's approval. On February 25, 2009, Citizens filed

14

a second reconsideration request with the EPA. The EPA's new Acting Regional Administrator granted the second reconsideration request on April 3, 2009.[7]

On April 9, 2009, the EPA moved this Court for a voluntary remand. The motion noted the Citizens' second reconsideration request raised "legal, technical and policy issues that warrant additional review," and stated the remand would allow the EPA "to conduct further administrative proceedings and provide an opportunity for additional public comment on the final rule." Alabama Power, ADEM, and TVA opposed the motion, asserting that such reconsideration was unlawful. The EPA responded and reiterated that it intended to reconsider the revision "through a public rulemaking process that includes both notice and an opportunity for comment." On September 28, 2009, we granted the EPA's motion and remanded the case to the EPA "on a limited basis for purposes of reconsidering the final rule under review." We also stayed proceedings in the Court "pending completion of such reconsideration."

D.     *The EPA's 2011 Disapproval of Alabama's SIP Revision*

---

[7] On April 7, 2009, Alabama Power filed a petition for review of the EPA's decision granting the second reconsideration request (2009 petition). In our September 28, 2009, order addressing the EPA's motion for voluntary remand, we also granted the EPA's motion to dismiss the 2009 petition for lack of jurisdiction.

15

While the proceedings were stayed, on remand, the EPA published a notice in the Federal Register on October 2, 2009, proposing "to either affirm the previous rulemaking (which approved the revisions) or, alternatively, amend its previous rulemaking (i.e., disapproving the revisions)." Alabama: Proposed Approval of Revisions to the Visible Emissions Rule and Alternative Proposed Disapproval of Revisions to the Visible Emissions Rule, 74 Fed. Reg. 50,930 (October 2, 2009). The EPA sought "public comment on the nature of the relationship between opacity and [particulate matter] emissions over both the short and long term and when the opacity and [particulate matter] mass emissions may have a predictable relationship to one another (e.g., when an opacity level of a certain amount would predict a [particulate matter] mass emission of another certain amount)." 74 Fed. Reg. at 50,934. The EPA provided a 75-day opportunity for public comment. Citizens and other interested persons submitted comments urging reversal of the 2008 approval; ADEM, Alabama Power, TVA, and UARG submitted comments in support of the 2008 approval.

On April 6, 2011, the EPA published a "Final Rule" disapproving ADEM's request to revise the visible emissions portion of Alabama's SIP. Alabama: Final Disapproval of Revisions to the Visible Emissions Rule, 76 Fed. Reg. 18,870 (April 6, 2011). The EPA concluded there was "a sufficient likelihood that the

16

SIP revision at issue in this action could allow increased mass emissions over what would have been allowed under the previously approved SIP rule and that, in the absence of additional information or limitations, the revision is not approvable under section 110(l)." 76 Fed. Reg. at 18,876.  The EPA noted it would "not have previously proposed approval if the record clearly demonstrated that the rule would have resulted in increased [particulate matter] in nonattainment areas." 76 Fed. Reg. at 18,884.  Although the EPA's 2008 approval was based in part on the 22% average daily opacity cap, following reconsideration, the EPA no longer accepted "that the average daily opacity limit is an appropriate or effective tool for evaluating the impact" of the revision on particulate matter emissions.  76 Fed. Reg. at 18,884. As a result of the EPA's disapproval, "Alabama's visible emissions rule that was in the SIP prior to the October 15, 2008, final action [became] the current SIP-approved rule." 76 Fed. Reg. at 18,870.

E.      *Consolidation of the 2008 and 2011 Petitions*

On April 8, 2011, Alabama Power filed a petition in this Court for review of the EPA's 2011 disapproval of the SIP revision.  Citizens intervened in support of the EPA's disapproval.  Alabama Power moved to consolidate Citizens' 2008 petition with Alabama Power's 2011 petition, and to stay the EPA's disapproval pending appeal.  Citizens moved to stay their 2008 petition pending resolution of

17

Alabama Power's 2011 petition. On May 12, 2011, we denied both motions to stay but granted Alabama Power's motion to consolidate the 2008 and 2011 petitions, treating the competing petitions as cross-appeals under Federal Rule of Appellate Procedure 28.1.

III. *Standard of Review*

Both petitions for review of the EPA's actions are brought pursuant to 42 U.S.C. § 7607(b)(1). We apply "the deferential standard of review set forth in the Administrative Procedure Act." *Sierra Club v. Johnson*, 436 F.3d 1269, 1273 (11th Cir. 2006). Under this standard, a final agency action will be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; exceeds the agency's statutory authority; or is "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), & (D). "Under this standard, we give deference to a final agency decision by reviewing for clear error, and we cannot substitute our own judgment for that of the agency." *Johnson*, 436 F.3d at 1273.

A challenge to the EPA's interpretation of the Clean Air Act is governed by the two-step analysis in *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–45, 104 S. Ct. 2778, 2781–83 (1984). First, we determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842,

18

104 S. Ct. at 2781. If Congress's intent is clear from the statutory language, we must "give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S. Ct. at 2781. Second, if Congress has not spoken and the statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S. Ct. at 2782.

## IV. *Discussion*

We are presented with challenges to both the 2008 approval and the 2011 disapproval in this consolidated appeal. We begin with the 2011 disapproval and consider whether the EPA complied with the statutory procedures set forth in the Clean Air Act. Because the EPA failed to make the statutorily required error determination, we conclude the 2011 disapproval was not authorized by the Clean Air Act. We also conclude the EPA's 2011 disapproval was not authorized by either its inherent authority or by this Court, and must therefore be vacated. We then address and dismiss challenges to the 2008 approval, and affirm the validity of that action.

### A. *The EPA's 2011 Disapproval of Alabama's SIP Revision*

Alabama Power contends the EPA's 2011 disapproval was unauthorized by law because the SIP Call procedure outlined in Section 110(k)(5) of the Clean Air

Act was the only process by which the EPA could revise Alabama's SIP. The

EPA claims the 2011 disapproval was authorized by Section 110(k)(6) of the

Clean Air Act because the EPA erroneously approved the SIP revision in 2008.

Additionally, the EPA claims the 2011 disapproval was authorized by its inherent

authority and by this Court's September 28, 2009, remand order.[8]

*1. Whether the Clean Air Act Authorized the EPA's 2011 Disapproval*

We first reject Alabama Power's contention that the SIP Call process

outlined in Section 110(k)(5) was the exclusive procedure by which the EPA

could revise Alabama's SIP.[9] As discussed previously, "[w]henever the

---

[8] The EPA also contends Section 553(e) of the Administrative Procedure Act (APA), which gives "an interested person the right to petition for the issuance, amendment, or repeal of a rule," authorized the 2011 disapproval. 5 U.S.C. § 553(e). While Section 553(e) authorized Citizens to petition for repeal of the 2008 approval, that provision does not displace the procedural requirements of the Clean Air Act for SIP revisions and error corrections. *See* 5 U.S.C. § 559 (stating the APA does "not limit or repeal additional requirements imposed by statute or otherwise recognized by law"). Thus, we must still consider whether the EPA's 2011 disapproval complied with the procedures set forth in the Clean Air Act.

[9] For this contention, Alabama Power cites language from this Court's decision in *Georgia Power*, a citizen enforcement action in which we rejected Sierra Club's argument that a 1999 Guidance Policy issued by the EPA had the effect of revising Georgia's SIP. 443 F.3d at 1354. We stated that "even if the EPA had intended its 1999 policy to alter the meaning of Georgia's existing" SIP, "the EPA would have been powerless to effect such a change absent formal SIP revision." *Id.* Citing the SIP Call provision, we noted that "[i]f the EPA believes that its current interpretation of the Clean Air Act requires Georgia to modify its [SIP], the EPA should require the state to revise its SIP to conform to EPA policy." *Id.* at 1355. Although Alabama Power contends *Georgia Power* established the SIP Call procedure as the exclusive procedure by which the EPA may reverse its initial approval, the cited language was in the context of analyzing Sierra Club's argument that an EPA policy document effected a change to a SIP. Moreover, the EPA itself stated that the Georgia SIP remained in effect regardless of the 1999 Guidance policy. *Id.* at 1354 n.12.

Administrator finds [the SIP] substantially inadequate," Section 110(k)(5) requires the EPA to notify the state of the substantial inadequacy, and then give the state the first opportunity to revise the SIP to conform with the Clean Air Act. 42 U.S.C. § 7410(k)(5). While Section 110(k)(5) provides an avenue for revising a substantially inadequate SIP, Section 110(k)(6) provides an avenue for correcting a SIP revision approved in error. Here, the EPA does not contend Alabama's SIP was "substantially inadequate"; rather, the EPA is claiming it made an "error" in 2008 when it initially approved the SIP revision. Thus, for our purposes, the lawfulness of the 2011 disapproval hinges on whether Section 110(k)(6) authorized the EPA's action.

Section 110(k)(6) permits the EPA to "revise" a SIP provision approved "in error" without "any further submission from the State." 42 U.S.C. § 7410(k)(6). Section 110(k)(6) "may" be invoked "[w]henever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof) . . . was in error." *Id.* The statute provides the procedure for correcting or "revis[ing]" the erroneous action: "the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State." *Id.*

21

The statute requires that "[s]uch determination and the basis thereof shall be provided to the State and public." *Id.*

As the plain language shows, Section 110(k)(6) has both discretionary and mandatory features. Through the use of the terms "whenever" and "may," Section 110(k)(6) confers discretion on the EPA to decide if and when it will invoke the statute to revise a prior action. *See, e.g.*, *N.Y. Pub. Interest Research Grp. v. Whitman*, 321 F.3d 316, 330–31 (2d Cir. 2003) (stating that the phrase "[w]henever the Administrator makes a determination" in Section 502(i)(1) of the Clean Air Act grants the EPA "discretion whether to make a determination"). To invoke Section 110(k)(6), however, the plain language of the statute requires a determination by the Administrator that "the action approving . . . [the] plan revision . . . was in error." 42 U.S.C. § 7410(k)(6); *see also Chevron*, 467 U.S. at 843, 104 S. Ct. at 2781 (noting the court must "give effect to the unambiguously expressed intent of Congress"). Our conclusion that the error determination is mandatory to invoke Section 110(k)(6)'s procedure is based on the last provision of the statute, which, using mandatory "shall" language, requires that the EPA provide "the State and public" with its error "determination and the basis thereof." 42 U.S.C. § 7410(k)(6). Thus, if the EPA chooses to invoke Section 110(k)(6) to

revise a prior action, Congress has required the EPA to articulate an "error" and provide "the basis" of its determination that an error occurred.

Here, the EPA has been unable to point to a determination of the error committed in the 2008 approval. Neither the text of the final rule disapproving the revision published in the Federal Register, nor the record before this Court, reveal that the EPA affirmatively made the requisite error determination. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50, 103 S. Ct. 2856, 2870 (1983) ("[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself."). Section 110(k)(6) is only referred to in passing in the final rule, when the "EPA notes that the process it has used for reconsidering and disapproving this SIP revision is entirely consistent with the process required under [S]ection 110(k)(6)." 76 Fed. Reg. at 18,878 n.18. Nowhere in the final rule does the EPA clearly articulate the alleged "error" committed in 2008 at the time of the initial approval. *See generally* 76 Fed. Reg. 18,870. We decline to speculate as to the error "determination and the basis thereof" when the EPA itself has failed to provide a cognizable error determination. *See Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1524 (11th Cir. 1991) ("Although we will bestow proper respect to the determinations of the [agency], we will not defer to an ethereal

23

determination that is not affirmatively stated by the administrative agency."); *see also Mitchell Energy Corp. v. FERC*, 651 F.2d 414, 418 (5th Cir. 1981) ("If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive." (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97, 67 S. Ct. 1575, 1577 (1947)). As such, the EPA has not complied with the procedural demands Congress articulated in Section 110(k)(6).[10]

Moreover, the EPA has failed to clarify the ambiguity surrounding the error committed in the 2008 approval despite opportunities to do so.[11] Although the EPA's brief relies on Section 110(k)(6) as authority for the 2011 "error correction," the brief fails to provide a clear statement of the error committed in the 2008 approval. In an effort to understand the EPA's assertion of error, we

---

[10] Although the dissent concludes the EPA's 2011 interpretation of Section 110(*l*) was substantively permissible, we do not reach this issue because the EPA failed to follow the Clean Air Act's mandate to provide "the State and public" with its error "determination and the basis thereof." 42 U.S.C. § 7410(k)(6).

[11] We note that we are reluctant to accept litigation positions as official justifications for agency action. *See, e.g.*, *Gonzalez v. Reno*, 212 F.3d 1338, 1350 (11th Cir. 2000) ("An after-the-fact rationalization of agency action—an explanation developed for the sole purpose of defending in court the agency's acts—is usually entitled to no deference from the courts.").

focused on this issue at oral argument. However, when questioned as to where we would find a statement in the record from the EPA regarding the error committed in the 2008 approval, counsel for the EPA stated "[y]ou are not going to find it in the Federal Register notice." Rather, counsel directed us to the EPA's 2009 motion for voluntary remand, which stated "the agency has determined that its prior action may have been in error or inadequately explained."

A statement in a motion for voluntary remand that there "may have been" error is insufficient to invoke Section 110(k)(6) as authority to revise a SIP. Section 110(k)(6) requires that the "determination and the basis thereof shall be provided to the State and public," such that the mere possibility of error is inadequate. Here, we are simply unable to locate the statutorily required error determination in the record so that we may evaluate whether the EPA's application of Section 110(k)(6) was appropriate. The EPA itself cannot point to the error committed in the 2008 approval; we are not permitted to rummage through the record and cobble one together for them.[12] *See Bowman Transp., Inc. v. Arkansas-*

---

[12] Although the dissent infers error from a combination of EPA comments, we decline to do so. At most, the EPA's statements in the record indicate that its 2008 findings were comparatively less strong than its 2011 findings, based on a different interpretation of Section 110(*l*). If we conclude this combination of EPA record statements constitutes an error determination under Section 110(k)(6), it is hard to imagine any statement by the EPA that would not qualify so long as the EPA argues, as it did here, that its prior findings could have been better. If the EPA would like to affirmatively declare the 2008 approach erroneous, our opinion leaves it free to do so, so long as it follows Congress's statutory procedures.

*Best Freight Sys., Inc.*, 419 U.S. 281, 285–86, 95 S. Ct. 438, 442 (1974) (noting that under the APA standard of review, courts may not supply "a reasoned basis for the agency's action that the agency itself has not given"); *see also Camp v. Pitts*, 411 U.S. 138, 142, 93 S. Ct. 1241, 1244 (1973) (stating that under the APA standard of review, "the focal point for judicial review should be the administrative record already in existence").

The EPA is fully capable of articulating an error when proceeding under Section 110(k)(6). For example, in a Federal Register notice issued one month after the final rule at issue here, the EPA invoked Section 110(k)(6) for authority to correct its previous full approval of Texas's Clean Air Act Prevention of Significant Deterioration (PSD) program. Determinations Concerning Need for Error Correction, Partial Approval and Partial Disapproval, and Federal Implementation Plan Regarding Texas's Prevention of Significant Deterioration Program, 76 Fed. Reg. 25,178 (May 3, 2011). The EPA explicitly articulated the error committed at the time of the prior action: "[The] EPA is determining in this rulemaking that it erred in fully approving Texas's PSD program in 1992 because at that time, the program had a gap, which recent statements by Texas have made particularly evident." 76 Fed. Reg. at 25,179. The EPA then took action "through

the error-correction mechanism provided under" Section 110(k)(6) to correct the 1992 error, revising its previous full approval to a partial disapproval. *Id.*[13]

Here, as the EPA conceded at oral argument, there is no such explicit error determination in the Federal Register notice for the SIP revision at issue. We are

[13] The EPA's clear invocation of Section 110(k)(6) in the 2011 correction of Texas's PSD program is not an outlier. In fact, articulating an error to invoke Section 110(k)(6) appears to have been the EPA's consistent practice and interpretation of Congress's procedural requirements for at least 15 years. *See* Limitation of Approval of Prevention of Significant Deterioration Provisions Concerning Greenhouse Gas Emitting-Sources in State Implementation Plans; Final Rule, 75 Fed. Reg. 82,536, 82,543–45 (Dec. 30, 2010) (identifying errors clearly and specifically invoking the error correction method of Section 110(k)(6)); Approval and Promulgation of Implementation Plans; Kentucky: Approval of Revisions to the State Implementation Plan, 75 Fed. Reg. 2,440, 2,440–41 (January 15, 2010) ("EPA has determined that [the state's] rule . . . was erroneously incorporated into the SIP because the rule is not related to the attainment and maintenance of the national ambient air quality standards."); *see also id.* at 2441 (specifying clearly that it was "removing" a previously approved rule "pursuant to section 110(k)(6) of the Clean Air Act" in order to "correct[]" its "error"); *id.* at 2443 (explaining that the rule being deleted "was erroneously incorporated into the SIP because it does not relate to the implementation, maintenance, and enforcement of the NAAQS in Kentucky"); Designation of Areas for Air Quality Planning Purposes; Arizona; Correction of Boundary of Phoenix Metropolitan 1-Hour Ozone Nonattainment Area, 70 Fed. Reg. 68,339, 68,339 (November 10, 2005) (declaring that the "EPA is taking direct final action to correct" its prior determination "under the authority of section 110(k)(6) of the Clean Air Act"); *see also id.* at 68,343 ("Based on the historic ambient monitoring data and prevailing wind patterns in the area, we conclude that we clearly erred in failing to consider data made available at the time of our September 1979 affirmation . . . ."); *id.* (concluding that based on overlooked data, the agency's prior boundary determination "was erroneous"); *id.* at 68,345 (stating that the agency's action was intended to "remov[e] unnecessary obligations that flow[ed] from the erroneous inclusion" of a portion of land in the EPA's boundary determination); Designation of Areas for Air Quality Planning Purposes; Correction of Designation of Nonclassified Ozone Nonattainment Areas; States of Maine and New Hampshire, 62 Fed. Reg. 14,641, 14,641 (March 27, 1997) (announcing the EPA's "decision to correct" its prior ozone designations "pursuant to section 110(k)(6) of the Clean Air Act (the Act), which allows the USEPA to correct its actions"); *see also id.* at 14,642 (concluding that its "earlier action . . . was in error," because the "information submitted by [the state] did not provide enough data" to make the designation); *id.* (declaring itself to be "correcting [an] error" based on "clearly inadequate" "information available at the time of the designation").

not holding that "magic words" are required to invoke Section 110(k)(6).  But, Congress has demanded, at a minimum, that the EPA affirmatively articulate the error committed at the time of the initial action if it chooses to rely on its Section 110(k)(6) authority to later revise that action.[14]

To recap, the Clean Air Act contains two provisions that grant the EPA authority to revise a SIP: Sections 110(k)(5) and (k)(6).  42 U.S.C. §§ 7410(k)(5) & (6).  The EPA does not purport to rely on the SIP Call procedures set forth in Section 110(k)(5), nor could it, as there was never a finding of substantial inadequacy.  42 U.S.C. § 7410(k)(5).  Although the EPA does purport to rely on the error-correction mechanism provided in Section 110(k)(6), the EPA did not "provide[] . . . the State and public" with the error determination Congress requires.  42 U.S.C. § 7410(k)(6). Thus, we conclude the EPA did not act in accordance with the Clean Air Act in the 2011 disapproval of Alabama's visible emissions SIP revision.

---

[14]  The dissent's approach of  inferring error where such error has not been affirmatively articulated by the EPA would limit the EPA's future ability to change policies.  As the dissent points out, it is not "unusual for a change in philosophy within an agency to result in a policy about-face."  However, a change in policy does not in and of itself indicate that the prior enforcement policy was erroneous, as there can be multiple permissible agency interpretations of a statute. *Chevron*, 467 U.S. at 843 n.11, 104 S. Ct. at 2782 n.11.  It is at least feasible that a change in administration would result in the EPA applying a 2008-type approach to Section 110(*l*)'s enforcement, and to declare this approach erroneous, without the EPA having done so itself, would limit the EPA's future enforcement flexibility.

*2. Whether the EPA Acted Within its Inherent Authority in Issuing the 2011 Disapproval*

As additional justification for the 2011 disapproval, the EPA contends it was acting within its inherent authority to reconsider decisions. 76 Fed. Reg. at 18,877–78. The EPA relies on *Gun South, Inc. v. Brady*, 877 F.2d 858 (11th Cir. 1989), and *New Jersey v. EPA*, 517 F.3d 574 (D.C. Cir. 2008), as support for its claim of inherent authority. We conclude the EPA cannot rely on any inherent authority here, where Congress has provided specific statutory procedures for revising a SIP. *See* 42 U.S.C. § 7410(k)(5), (k)(6).

*Gun South* considered the authority of the Bureau of Alcohol, Tobacco, and Firearms (Bureau) to temporarily suspend the importation of assault rifles under the Gun Control Act. *Gun S.*, 877 F.2d at 860–61. After noting neither the Gun Control Act nor its implementing regulations expressly authorized the suspension, we concluded "the Bureau must necessarily retain the power to correct the erroneous approval of firearms import applications," as well as "the corollary power to temporarily suspend the importation of firearms." *Id.* at 862. As support for our conclusion that the temporary suspension fell within the Bureau's implied authority, we recognized the general rule that agencies possess implied authority "to reconsider and rectify errors even though the applicable statute and regulations

29

do not expressly provide for such reconsideration." *Id.* Thus, *Gun South* recognized the Bureau's implied authority to impose a temporary suspension where the Gun Control Act lacked an express provision authorizing such action. *Id.*[15]

In contrast to the Bureau in *Gun South*, here, the EPA had statutory tools available to revise the SIP: Sections 110(k)(5) and (k)(6) of the Clean Air Act. The EPA chose to invoke Section 110(k)(6) of the Clean Air Act to "revise" a SIP revision approved "in error," 47 U.S.C. § 7410(k)(6), but failed to articulate what error was committed in the 2008 approval. We decline to imply any authority to act beyond the confines of the EPA's statutory authority where the Clean Air Act provides express provisions for revising and correcting a SIP. *See, e.g.*, *Mich. v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) (noting the EPA is "a creature of statute," and may exercise "only those authorities conferred upon it by Congress").

We note that our conclusion is consistent with *New Jersey*, 517 F.3d at 582, where the D.C. Circuit recognized that "[a]n agency can normally change its position and reverse a decision." The D.C. Circuit noted an important

---

[15] As support for our finding of implied authority, we also relied on the legislative history in the Gun Control Act illustrating "Congress's intent absolutely to bar the importation of firearms outside of the narrow statutory exceptions." *Gun S.*, 877 F.2d at 862. Additionally, we noted the Bureau did not interpret the Gun Control Act as prohibiting a temporary ban, and deferred to the Bureau's interpretation because the plain language of the statute did not compel a different interpretation. *Id.* at 863.

30

qualification on that general principle: "Congress, however, undoubtedly can limit an agency's discretion to reverse itself." *Id.* at 583. In *New Jersey*, the court held Congress did just that by including express delisting requirements in the Clean Air Act. *Id.* The D.C. Circuit concluded those express provisions precluded the EPA from claiming it possessed inherent authority to delist a regulated unit without following the statutory procedure. *See id.* (noting that "when Congress has provided a mechanism capable of rectifying mistaken actions . . . it is not reasonable to infer authority to reconsider agency action" (internal quotation marks omitted)). Likewise, the Clean Air Act's express statutory provisions for revising and correcting a SIP preclude the EPA's reliance on any claim of inherent authority here.

### 3. Whether the 2011 Disapproval was Court-Authorized

As a final source of authority, the EPA places great weight on this Court's September 28, 2009, order granting its motion for voluntary remand. The EPA relies on the "memoranda filed by the parties" to define "[t]he scope of authorization [the] EPA received from the Court," and contends "[c]ontext and logic underscore that [the] EPA obtained authorization from this Court to proceed as it did on remand." We disagree with this bold assertion.

31

On April 9, 2009, the EPA moved this Court for a voluntary remand. Our September 28, 2009, order granting the motion provided as follows:

> The EPA has filed a "Motion for Voluntary Remand" in Appeal No. 08-16961, which is a petition for review of the final rule approving revisions to the Alabama State Implementation Plan. The "Motion for Voluntary Remand," construed as a motion for limited remand to permit the EPA to conduct reconsideration proceedings and to stay this Court's proceedings pending resolution of reconsideration, is GRANTED. Appeal Number 08-16961 is hereby REMANDED to the EPA on a limited basis for purposes of reconsidering the final rule under review, and proceedings in this Court shall remain STAYED pending completion of such reconsideration. The EPA is directed to provide the Court with reports every sixty (60) days regarding the status of the reconsideration proceedings.

September 28, 2009, Order Granting Motion for Voluntary Remand at 2–3. Nothing in the order explicitly authorized the EPA to act outside the statutory procedures set forth in the Clean Air Act. The order simply permitted the EPA to conduct reconsideration proceedings on remand, and stayed the appeal pending completion of such reconsideration.

We decline the EPA's invitation to imply rulings on substantive issues from this seemingly straightforward remand order. Even assuming we could divine "court authorization" for the 2011 disapproval from this order, the order has no precedential value. Our rules state that "[a] ruling on a motion or other interlocutory matter, whether entered by a single judge or a panel, is not binding

32

upon the panel to which the appeal is assigned on the merits, and the merits panel may alter, amend, or vacate it." 11th Cir. R. 27-1(g). Accordingly, we reject the EPA's "court authorization" argument as meritless.

### 4. The 2011 Disapproval is Vacated

In sum, because the 2011 disapproval was not conducted according to the statutory procedures set forth in the Clean Air Act, we must set it aside. *See* 5 U.S.C. § 706(2)(C),(D) (stating a final agency action must be set aside if it exceeds the agency's statutory authority or is "without observance of procedure required by law"). We therefore grant Alabama Power's petition challenging the 2011 disapproval and vacate the EPA's final disapproval of revisions to Alabama's visible emissions rule. Because the April 6, 2011, final rule is vacated, the October 15, 2008, final rule approving the revisions stands as the last final action taken on the proposed revision. Thus, we must next consider Citizens' petition challenging the October 15, 2008, final rule.

### B. The EPA's 2008 Approval of Alabama's SIP Revision

Citizens contend the 2008 approval violates Section 110(*l*) of the Clean Air Act. Citizens make no specific argument as to how the EPA's 2008 approval violated Section 110(*l*) of the Clean Air Act; rather, they rely on their arguments as to how the EPA's 2011 disapproval did *not* violate the Clean Air Act. Citizens

also challenge two long-standing provisions of Alabama's SIP that were not a part of Alabama's 2008 submissions.[16]  The EPA does not defend the 2008 approval, but Alabama Power, as an intervenor in the 2008 appeal, claims the 2008 approval was valid and lawful.

1.    *Whether the 2008 Approval Violates Section 110(l) of the Clean Air Act*

Section 110(*l*) of the Clean Air Act, entitled "Plan revisions," provides in pertinent part that "[t]he Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress . . . or any other applicable requirement of this Act."  42 U.S.C. § 7410(*l*).  The question of whether the 2008 approval violates the Clean Air Act depends on the meaning of the phrase "would interfere."  The Sixth Circuit has concluded that "[a] court searching for the meaning of 'interfere' [in Section 110(*l*)] or for a clearly preferred mechanism for determining that which interferes wades into ambiguity, the only solution to which is the deferential *Chevron* step two."  *Ky. Res. Council*, 467 F.3d at 995.  We agree, as the Clean Air Act "does not directly speak to how a determination of interference is to be made."

---

[16]  Citizens also make a vague and general assertion that the proposed revision leaves Alabama incapable of detecting particulate matter violations.  Citizens have failed to offer any support for this claim, and there is no indication that the SIP revision renders Alabama incapable of detecting violations and enforcing the visible emissions limits.

*Id.* (internal quotation marks omitted). Thus, under *Chevron* step two, we defer to the EPA's interpretation of Section 110(*l*) if it is based on a permissible construction of the statute. *Chevron*, 467 U.S. at 842–43.

In the 2008 approval, the EPA interpreted Section 110(*l*) to permit approval of the SIP revision "'unless the agency finds it will make air quality worse.'" 73 Fed. Reg. at 60,960 (quoting *Ky. Res. Council*, 467 F.3d at 995). The EPA then concluded the proposed SIP revision satisfied Section 110(*l*)'s requirements because the revision would not interfere with either the annual or 24-hour particulate matter NAAQS. 73 Fed. Reg. at 60,959.

The EPA's interpretation is a permissible reading of Section 110(*1*), and thus entitled to deference. The Sixth Circuit reached this same conclusion in *Kentucky Resources Council*, 467 F.3d at 996, and we find its reasoning persuasive. As the Sixth Circuit noted, the EPA's interpretation gives the states flexibility and "does service to a fundamental premise underlying the Clean Air Act scheme, which is that the states have the primary responsibility for ensuring that the NAAQS are met." *Id.*

We agree that where interference is not demonstrated, approval of the state's SIP revision appropriately respects the state's choice to achieve air quality standards with "whatever mix of emission limitations it deems best suited to its

particular situation." *Train*, 421 U.S. at 79, 95 S. Ct. at 1482; *see also Fla. Power & Light Co.*, 650 F.2d at 581 ("The state is 'at liberty' to devise the particular components of its pollution control plan so long as the plan is adequate to meet the standards mandated by [the] EPA."). Because we find the EPA's interpretation reasonable and entitled to deference, the EPA's 2008 approval utilizing that interpretation does not violate Section 110(*l*) of the Clean Air Act.

Although we conclude the EPA's interpretation of Section 110(*l*) in the 2008 approval was permissible, we pass no judgment on the EPA's interpretation of Section 110(*l*) in the 2011 disapproval. There may be more than one permissible interpretation of a statute, *see Chevron*, 467 U.S. at 843 n.11, 104 S. Ct. at 2782 n.11, and so long as the interpretation is permissible, it does not matter whether the interpretation "is a dramatic shift in EPA policy," *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1219 (11th Cir. 2009).

> 2. *Whether the Automatic Exemption and Director's Discretion Provisions Violate the Clean Air Act*

Citizens contend the rule providing automatic exemptions for "startup, shutdown, load change, and rate change or other short, intermittent periods of time," *see* Ala. Admin. Code r. 335-3-4-.01(1)(c), may not be approved as part of Alabama's SIP because such a rule would prevent the limitations of emissions on a

36

continuous basis.  Citizens also claim the SIP's "director's discretion" provisions,

*see* Ala. Admin. Code r. 335-3-4-.01(1)(d), are prohibited by the Clean Air Act

because such provisions give the state the power to change rules unilaterally.

Citizens' attempt to challenge the EPA's approval of the automatic

exemption and director's discretion provisions is untimely.  Section 7607(b)(1)

requires that "[a]ny petition for review under this subsection shall be filed within

sixty days from the date notice of such promulgation, approval, or action appears in

the Federal Register."  42 U.S.C. § 7607(b)(1).  The automatic exemption for

"startup, shutdown, load change, and rate change or other short, intermittent

periods of time," Ala. Admin. Code r. 335-3-4-.01(1)(c), became an approved part

of Alabama's SIP in 1972.  *See* Approval and Promulgation of Implementation

Plans, 37 Fed. Reg 10,842, 10,847–48 (May 31, 1972).  The "director's discretion"

provision, Ala. Admin. Code r. 335-3-4-.01(1)(d), became an approved part of

Alabama's SIP in 1993.  *See* Alabama: Approval of the Visible Emission

Regulations, 58 Fed. Reg. 25,566 (April 27, 1993).  Accordingly, Citizens' attempt

to challenge these provisions now is untimely.  42 U.S.C. § 7606(b)(1).

Moreover, we reject Citizens' contention that the EPA reopened these

provisions for review by considering the 2008 SIP revision.  The EPA made clear

from the outset that "[t]he director's discretion provisions under Alabama rule 335-

3-4.01(1)(c) and (d) would be unchanged by [the 2008] SIP revision," and that the provisions were "not being revised by ADEM or reviewed by [the] EPA at present." 73 Fed. Reg. at 60,958 n.1. The EPA also stated that "nothing in [the Federal Register] notice should be considered as approving those provisions." *Id.* There is no support for the Citizens' contention that the EPA reopened these issues.

We also reject Citizens' claim that the EPA "constructively" reopened the provisions by considering the 2008 SIP revision. Citizens rely on *Sierra Club v. EPA*, 551 F.3d 1019 (D.C. Cir. 2008), in which the D.C. Circuit stated a "constructive reopening occurs if the revision of accompanying regulations 'significantly alters the stakes of judicial review.'" *Id.* at 1025 (quoting *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1227 (D.C. Cir. 1996)). The D.C. Circuit concluded the EPA had constructively reopened a startups, shutdowns, and malfunctions (SSM) exemption by "completely chang[ing] the regulatory context for its SSM exemption by stripping out virtually all of the SSM plan requirements that it created to contain the exemption." *Id.* (internal quotation marks omitted) (emphasis omitted).

Prior to the rulemakings at issue in *Sierra Club*, the EPA had limited the SSM exemption by (1) requiring sources to comply with an SSM plan during periods of SSM, (2) requiring review and approval of the SSM plan, (3) requiring

38

that the SSM plans be made available to the public, such that the public could participate in the permit approval process, and (4) making the SSM plan directly enforceable. *Id.* at 1025. In the rulemakings challenged by Sierra Club, however, the EPA—while not officially reopening the SSM exemption—eliminated all of the aforementioned safeguards, meaning the SSM plans were no longer mandatory, enforceable, subject to approval, or publicly available. *Id.* at 1025–26.

We are not presented with an analogous situation. Citizens have not pointed to any changes, minor or major, to the automatic exemption for "startup, shutdown, load change, and rate change or other short, intermittent periods of time," or to the "director's discretion" provisions. Citizens have also failed to demonstrate that the EPA has created a new regulatory context sufficient to constructively reopen the provisions—there is simply no evidence the provisions, or the enforcement of the provisions have changed in any way. Because the EPA did not reopen these provisions, constructively or otherwise, we decline to review them on appeal.

Accordingly, we deny Citizens' petition challenging the 2008 approval and affirm the EPA's final rule approving revisions to Alabama's visible emissions rule. 73 Fed. Reg. at 60,957. As a final matter, we decline to follow Citizens' and the EPA's suggestion that we ignore the 2008 approval. If the EPA wishes to

39

revise or correct the 2008 approval, it may do so by following the statutory procedures provided in the Clean Air Act. *See* 42 U.S.C. §§ 7410(k)(5), (k)(6).

## V. *Conclusion*

Alabama Power's petition is hereby **GRANTED**, and the EPA's 2011 disapproval is **VACATED**.[17] Citizens' petition is hereby **DENIED**, and the EPA's 2008 approval is **AFFIRMED**.

---

[17] On June 21, 2011, Alabama Power filed a motion to direct the EPA to supplement the administrative record. The motion is denied.

MOLLOY, District Judge, concurring in part and dissenting in part:

I agree with much of the Court's opinion, including its determination that the EPA was not required to issue a SIP call as the exclusive means of revising the SIP approved in 2008. To that extent, I concur in the majority opinion. But I respectfully dissent from the Court's determination that "[n]either the text of the final rule disapproving revision published in the Federal Register, nor the record before this Court, reveal that EPA affirmatively made the requisite error determination." Majority Op. at 23.

My disagreement is based on two specific differences with the Court's opinion. First, the EPA's notices and decisions in the Federal Register quite clearly describe how the agency believes it was in error in approving the 2008 proposed revision. Second, the process that the EPA followed was more accommodating to the State and to the affected industries than what will inevitably follow from Court's decision, as applied in future cases. I believe we should dismiss the 2008 action for lack of jurisdiction and affirm the EPA's 2011 disapproval.

I.

When the EPA published notice that it was proposing either to affirm its approval or disapprove Alabama's proposed revision, it said:

41

EPA's prior approval notice provides extensive discussion of the reasons why EPA concluded in that notice that section 110(*l*) had been satisfied. In particular, EPA stated as grounds for this conclusion that: "(1) The revision would not increase the allowable average opacity levels; and (2) the relationship between changes in opacity and increases or decreases in ambient $PM_{2.5}$ levels cannot be quantified readily for the sources subject to this SIP revision, and is particularly uncertain for short-term analyses."

74 Fed. Reg. 50930, 50932–33 (Oct. 2, 2009) (quoting 73 Fed. Reg. at 60959 (Oct. 15, 2008)) (internal citations and footnote omitted).

Given those two reasons for approving the 2008 proposed revision, the error that the EPA believes it committed is identified in the thorough description set forth in the Federal Register:

Based on the information received to date, EPA believes that increases or decreases in $PM_{2.5}$ emissions based on short-term increases in opacity cannot be quantified readily for the sources subject to this SIP revision. There are several contributors to the uncertainties associated with relating mass emissions to increases in opacity, including: (1) Differences between combustion technology characteristics and fuel components, (2) differences in control technology types, temperatures at which they operate, and load characteristics, (3) the recognition that both opacity and mass emissions are subject to significant variability over short periods of time and fluctuations such that one may act independently of the other, and (4) differences between the mass of particles that exists at the point of opacity measurement by the COMS (e.g., in the stack) and the direct $PM_{2.5}$ that forms immediately upon exiting the stack (that are related to fuel components more than to control technology).

*Id.* at 50933. In this passage, the agency makes clear that *because* "the relationship between changes in opacity and increases or decreases in ambient PM$_{2.5}$ levels cannot be quantified readily for the sources subject to this SIP revision" and because there are at least four distinct reasons that little or no change in opacity might yet be accompanied by a significant increase in actual emission of particulate matter, the EPA cannot say whether the proposed revision "would interfere with any applicable requirement concerning attainment." Because § 110(*l*) of the Clean Air Act requires the EPA to ensure that the proposed revision will *not* interfere with any applicable requirement concerning attainment, the EPA's approval did not comply with the Act. That is the identified error or mistake the agency made.

The EPA also described a second error, an extension of the first, when it announced its disapproval of the 2008 proposed revision. It said that in its prior approval of the revision:

> [W]e established a *new metric* of "average *daily* opacity" (and "average *quarterly* opacity") and concluded that section 110(*l*) did not prohibit approval of a SIP revision that allowed significantly increased opacity levels for longer consecutive periods of time because the revision would not increase the allowable average opacity levels (on either a quarterly or daily basis). *This analysis was focused on opacity and operational conditions regarding opacity as opposed to a focus on the relationship between opacity and PM mass emissions . . . .*

43

76 Fed. Reg. 18870, 18874 (Apr. 6, 2011) (emphases added). In short, the prior analysis looked at numbers, not at what the numbers were supposed to index or signify. The mistaken prior analysis was inconsistent with the requirements of the Act.

When it announced its final decision to disapprove the proposed revision, the EPA referred back to the two identified reasons in support of approval that were stated in its Notice of October 2, 2009. It said:

> [B]oth of the findings that provided the foundation for [EPA's] initial approval of the SIP revision were not strong enough to support approval under the [Clean Air Act]. EPA concludes that, as it was described in the Submittals, the concept of "average daily opacity" is not a useful tool for evaluating whether the Submittals are likely to maintain current air quality, particularly given the lack of other limitations on opacity exceedances in the Submittals. . . .

76 Fed. Reg. 18870, 18874–75 (Apr. 6, 2011) (emphases added).

All of these statements describe errors of judgment. The EPA does not use the specific words "error" or "correction." Nor does it identify a mathematical mistake or linguistic slip. And it does not provide an easy descriptor of the error or expressly invoke § 110(k)(6). But, just as the majority does not require the EPA to intone "magic words," Majority Op. at 28, there is no reason why such omissions should doom the agency's action.

44

The majority states, "Congress has required the EPA to articulate *an 'error'* and provide 'the basis' of its determination that an error occurred." *Id.* at 23 (emphasis added). But that is not exactly what the Act says. The Act says the EPA may revise its prior approval, disapproval, or promulgation whenever it determines that its action "was *in* error." Section 110(k)(6) (emphasis added). When error is spoken of as a place, the intent is often to include misjudgment rather than mere mistake or omission.

Because the EPA described the errors of judgment that it sought to correct, §110(k)(6) authorized its reconsideration of its approval of Alabama's proposed SIP revision. That being so, the agency had not "completed its decisionmaking process" as to the 2008 approval, *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992), and the erstwhile approval became "interlocutory in nature," *National Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236–37 (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). *See also Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 479 (2001). Therefore, I would dismiss the 2008 action for lack of jurisdiction.

## II.

I would also uphold the EPA's action in 2011 disapproving the proposed revision. The proposal, after all, would apply not only to the coal-fired utilities represented in this action but also to cement manufacturing facilities, as well as pulp and paper facilities, entities which might generate different kinds of particulate matter

45

in different ways with different consequences. *See* 76 Fed. Reg. 18873 & n.8; 74 Fed. Reg. at 50933. The EPA found that, while "[o]ne of the primary purposes of opacity limits is to ensure that PM control devices are operating within normal parameters," the proposed revision might result in failure to alert an operator or the State or EPA to an equipment malfunction that is not only causing increased opacity but failing to control  types of PM emissions that the operator mistakenly believes to be under control. 76 Fed. Reg. at 18874. "[A] rule that allows no more than one 6-minute exceedance per hour and opacity readings no greater than 40 percent clearly requires more effective control equipment and/or operating procedures than . . . a rule that allows longer consecutive periods of exempt opacity excursions and at higher opacity levels." *Id.* at 18876.

Further, the EPA found:

[E]lements that are missing from the submitted modeling include: data from all the sources and source categories affected by the Alabama Submittals[1]; a demonstration of the relationship between PM emissions and opacity at a particular facility and source-category; consideration of emissions from other sources in the modeled area; condensable PM data; explanation for background PM levels used in the evaluation; and an explanation of the use of $PM_{10}$ as a surrogate for $PM_{2.5}$; among other concerns.

---

[1] For instance, while Alabama Power Company submitted models, cement manufacturers and pulp and paper facilities, whose operations would also be affected by the proposed revision, apparently did not. 74 Fed. Reg. at 50933; 76 Fed. Reg. at 18873.

*Id.* at 18875. The EPA concluded that "it is reasonably foreseeable that approving the Alabama Submittals would allow increased mass emissions, for at least some sources and under at least some conditions, over the PM emission levels that would have been allowed" under the previous rule. Consequently, "[S]ection 110(*l*) requires disapproval . . . absent additional limitations which would significantly diminish the likelihood that mass emissions increases will occur." *Id.* at 18876.

In its 2011 disapproval, in my view, the EPA permissibly construed § 110(*l*) and acted neither arbitrarily nor capriciously when it determined that an increase in opacity limits will "interfere" with the $PM_{2.5}$ standard for attainment by making it more difficult for operators to spot malfunctions and by exempting more emissions of particulate matter. Although opacity is not attainment and is not an air-quality standard, it is aptly described as an "applicable requirement concerning attainment." These determinations are squarely within the heartland of EPA expertise and the sphere of judicial deference to it under *Chevron*. That being so, the law requires us to defer to the agency determination in this case where the meaning of words or phrases in a statute or regulation is evident from context. *See Nat'l Ass'n of Home Builders vs Defenders of Wildlife*, 551 U.S. 644, 666 (2007).

Of greater concern is what I perceive will be the consequence of the majority's reasoning. The EPA's Notice of October 2, 2009, solicited input on whether its 2008

approval was, in fact, "in error." I believe that the EPA complied with § 110(k)(6) in making this request for input because the statute requires it to undertake any revision of its prior action "in the same manner as the approval" but "without requiring any further submission from the State." When it gave notice of its intent to reconsider, the EPA said:

> This rulemaking is part of EPA's reconsideration process on our October 15, 2008, final action approving Alabama's visible emissions SIP revisions. EPA is seeking public comment on proposals to affirm our prior action, which approved the SIP revisions, or amend and disapprove the revisions to Alabama SIP rule 335-3-4-.01 ("Visible Emissions"), submitted initially in 2003 and significantly revised and re-submitted on August 22, 2008.

74 Fed. Reg. at 50934.

The EPA could have simply decreed in 2009 that it made an error of judgment in approving Alabama's proposed revision because the evidence was not sufficient to ensure that allowing opacity greater than 20% for more extended periods of time would not result in emission of more particulate matter. Had it done so, under the majorities' reasoning we could not now conclude that the EPA's reconsideration was faulty. It is not particularly unusual for a change in philosophy within an agency to result in a policy about-face or to perceive error in earlier decisions. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009); *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1034–39 (D.C. Cir. 2012); *Chamber of Commerce*

*v. EPA*, 642 F.3d 192, 196–66 (D.C. Cir. 2011); *see also Sierra Club v. Ga. Power Co.*, 443 F.3d 1346, 1353–54 & n.11 (11th Cir. 2006) (describing the EPA's clarification in 2001 of guidance that it provided in 1999). What one person calls "a reevaluation of which policy would be better in light of the facts," *Home Builders*, 682 F.3d at 1038, another person may reasonably call a determination that prior policy was "in error," § 110(k)(6).

But, here, instead of taking wholly on itself the determination that an error occurred, EPA invited the interested parties to provide input on the question of whether it erred. It specifically asked for plant- or industry-specific data about the relationship between opacity and real amounts of particulate emissions into the ambient air. As a result of the EPA's willingness to listen to these responses and consider additional data from interested parties before it made a final decision whether to change course, the majority concludes that the EPA exceeded its authority. If this reasoning is correct, and I do not think it is, the lesson for the EPA is—declare errors first, and investigate whether they exist later. It has a "verdict first, evidence later" feel to it.

No one affected by EPA's decision in this case claims they were unable to understand why the agency was concerned about its prior action. On the contrary, both the State and the utility industries avoid making any such claim, asserting instead

that EPA failed to identify a "technical or clerical error"—words that cannot be found in § 110(k)(6)'s phrase "in error." No one has even attempted to refute the EPA's concern about the relationship between opacity and particulate matter or that consideration of the relationship is an issue wholly within the mainstream of the agency's responsibilities.

In my view, the process functioned just as it is supposed to. The EPA did not hide the ball, it did not do anything that was irrational, arbitrary, or capricious, it gave ample opportunity to interested groups to explain their own positions and allay the EPA's concerns, and, at least in my opinion, it clearly explained its own concerns and final decision. I believe the record fails to support the appellant's position and, under applicable law, supports the EPA's actions and decision.

The majority's conclusion that the EPA "failed to articulate an error" reflects a determination of what the majority expects the articulation of error to sound like and less to do with the EPA's process or its findings about air quality and particulate matter.

When the question is whether the EPA had authority to reconsider under § 110(k)(6), we should read what the agency said in the Federal Register in the particular case at hand and ask whether the agency says that it was wrong on a prior occasion. Doing so remains the best way to avoid asking for "magic words" and is

the best way to determine whether the agency's actions—regardless of its brief or oral argument, *see* Majority Op. at 25–26 & n.11—were consistent with the law enacted by Congress.

For these reasons, I respectfully dissent.